**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| DONALD L. DIETZ JR.,<br><br>Plaintiff,<br><br>v.<br><br>NOVO NORDISK INC.,<br>NOVO NORDISK A/S,<br>ELI LILLY AND COMPANY INC.,<br><br>Defendants. | COMPLAINT & JURY DEMAND<br><br>CIVIL ACTION NO: 2:26-cv-02028 |

## DIRECT FILING ORDER AND VENUE

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections, and privileges, and obligations of the Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Middle District of Pennsylvania as Plaintiff's venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

_X_ Plaintiff currently resides in Shirleysburg, Pennsylvania.

_X_ Plaintiff purchased and used Defendant(s)' products in Shirleysburg, Pennsylvania.

1

_X_ The Original Venue is a judicial district in which Defendants Novo Nordisk Inc., Novo Nordisk A/S and Eli Lilly and Company Inc. reside, and all Defendants are residents of the State in which the district is located (28 U.S.C. § 1391(b)(1)).

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically, (28 U.S.C. § 1391(b)(2)):

_X_ There is no district in which an action may otherwise be brought under 28 U.S.C. § 1391, and the Original Venue is a judicial district in which Defendants Novo Nordisk Inc., Novo Nordisk A/S and Eli Lilly and Company Inc. are subject to the Court's personal jurisdiction with respect to this action (28 U.S.C. § 1391(b)(3)).

__ Other reason (please explain): _____.

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff, DONALD L. DIETZ JR., by and through the undersigned counsel, and brings this complaint against Defendant Novo Nordisk Inc. and Eli Lilly and Company Inc. (hereinafter "Defendants" or "Novo Nordisk" or "Eli Lilly and Company Inc."), for damages suffered by Mr. Dietz Jr. who was severely injured as a result of Defendants' widespread marketing of its drugs, Ozempic and Mounjaro, and his subsequent use of Ozempic and Mounjaro, an injectable prescription medication that is approved for improvement of blood sugar (glucose) in adults with type 2 diabetes and weight loss, and alleges as follows:

### PARTIES

1. At all relevant times hereto, Plaintiff DONALD L. DIETZ JR was a resident and citizen of the state of Pennsylvania in the county of Shirleysburg.

2. Plaintiff was prescribed and took Ozempic and Mounjaro as directed by his

physicians.

3.     As a result of his use of Ozempic and Mounjaro, Mr. Dietz Jr. developed bilateral non-arteritic anterior ischemic optic neuropathy (NAION) and suffers severe physical and emotional injuries and radical changes to his lifestyle given his severe loss of sight.

4.     Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

5.     Defendant Novo Nordisk Inc. is wholly owned by Novo Nordisk US Commercial Holdings, Inc.

6.     Novo Nordisk is the manufactures of Ozempic.

7.     Eli Lilly and Company Inc. ("Eli Lilly") is an Indiana corporation that has its principal place of business at 893 S Delaware St, Indianapolis, IN 46225.

8.     Defendant Eli Lilly and Company Inc. is a publicly traded company owned mostly by Lilly Endowment Inc.

9.     Eli Lilly and Company Inc. is the manufacturer of Mounjaro.

10.     The Novo Nordisk Defendant's website states that "the vast majority of our U.S. injectable diabetes and obesity products are produced and packaged at the Clayton aseptic fill-finish site. Upon information and belief, this refers to Novo Nordisk's manufacturing facility in Clayton, North Carolina, operated by Novo Nordisk Pharmaceutical Industries LP.

11.     Upon information and belief, Defendant Novo Nordisk Pharmaceutical Industries LP is the labeler for Ozempic, and Defendants Novo Nordisk A/S and Novo Nordisk Inc. are identified on Ozempic's label. The Novo Nordisk Defendants also designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Ozempic.

12.     Upon information and belief, Defendants failed to warn physicians and the end

3

users of Ozempic and/or Mounjaro of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

13.     Upon information and belief, Defendants failed to warn the end users of Ozempic and/or Mounjaro of the complications and devastating effects of which the company knew or should have known.

14.     Upon information and belief, Defendants' marketing was deceptive and misleading about the true risks associated with the use of Ozempic and/or Mounjaro, risks which the companies knew or should have known.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of the State of Pennsylvania. and each Defendant is neither incorporated nor has its principal place of business in the State of Pennsylvania.

16.     This Court has personal jurisdiction over Defendants consistent with the United States Constitution and 42 Pa. Consol. Stat. Ann. §5322 (Pennsylvania's "long arm" statute), as Plaintiff's claims arise out of Defendants' transaction of business, their  tortious acts within the Commonwealth of Pennsylvania, their doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, and by virtue of Defendants' substantial, continuous, and systematic contacts with the Commonwealth of Pennsylvania.

17.     This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

4

18.     Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District. Defendants routinely market their products at issue in this District and conduct business in this District related to their products at issue in the state of Pennsylvania. Venue is further proper as Plaintiff is a resident of Pennsylvania, was prescribed Defendants' product in the state of Pennsylvania, and it is where her injury and subsequent treatment has occurred.

## BACKGROUND

### I.     The Development and Approval of Ozempic and Wegovy

19.     In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist— the drug caused the rats to stop eating almost entirely.[1]

20.     GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

21.     To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

---

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 13, 2025).
[2] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Feb. 13, 2025)
[3] *Id*.
[4] *Id*.

22.     "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

23.     Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[6]

24.     Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity.[7]

25.     Years later, in 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza,[8] at which point Novo Nordisk moved forward with studying the drug for weight loss.[9]

26.     After clinical trials, in 2014 the FDA approved liraglutide for treatment of obesity under Novo Nordisk's brand name Saxenda as a daily injectable.[10]

27.     Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their weight.[11]

28.     In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[12]

---

[5] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 13, 2025).
[6] Id.
[7] Id.
[8] Jackson, S. H., Martin, T. S., Jones, J. D., Seal, D., & Emanuel, F. (2010). Liraglutide (victoza): the first once-daily incretin mimetic injection for type-2 diabetes. *P & T: a peer-reviewed journal for formulary management*, 35(9), 498–529. https://pmc.ncbi nlm nih.gov/articles/PMC2957743/ (last visited Feb. 13, 2025).
[9] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Feb. 13, 2025).
[10] Id.
[11] Id.
[12] Id.

6

29. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016 announced submission of Ozempic's New Drug Application (NDA) to the FDA for regulatory approval of once-weekly injectable in 0.5 mg or 1 mg for treatment of type 2 diabetes. The announcement stated "once-weekly" Ozempic had a safe and well-tolerated profile, and that the most common adverse event was nausea.[13]

30. On December 5, 2017, the FDA approved the application and granted premarket approval as NDA 209637 to Defendant Novo Nordisk Inc.[14]

31. On September 20, 2019, the FDA approved Novo Nordisk's application to market and sell Rybelsus as the oral GLP-1 receptor agonist as NDA 213051 to Defendant Novo Nordisk. Like Ozempic, the active ingredient in Rybelsus is semaglutide.

32. Defendant Novo Nordisk continues to be the holder of the NDAs and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label. [15]

33. Just one year after Ozempic's approval for diabetes, Novo Nordisk started a clinical trial in patients who were overweight or suffered from obesity.[16]

34. Defendant Novo Nordisk had completed the clinical trial studying semaglutide for weight loss, and its results were published February 10, 2021.[17]

35. In addition to the results, the published study, which was funded by Novo Nordisk, argued: "Obesity is a chronic disease and global public health challenge."[18]

---

[13] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited Feb. 13, 2025).

[14] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2017/209637s000ltr.pdf (last visited Feb. 13, 2025).

[15] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2019/213051Orig1s000Approv.pdf

[16] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2017/209637s000ltr.pdf (last visited Feb. 13, 2025).

[17] Wilding John P.H., Batterham Rachel L., Calanna Salvatore, et al. Once-weekly semaglutide in adults with overweight or obesity. *New England Journal of Medicine*. 2021;384(11):989-1002. doi:10.1056/NEJMoa2032183

[18] *Id*.

36.    On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental a new drug application for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[19] On January 16, 2020, the FDA approved this new indication.[20]

37.    Then, on May 28, 2021, Defendant Novo Nordisk Inc. submitted another sNDA requesting approval for a higher 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[21]

38.    In their press release, Defendant Novo Nordisk represented Ozempic as having "proven safety and efficacy," and they continued to advertise that "it can help many patients lose some weight."[22] As with its prior press releases, Novo Nordisk disclosed Important Safety Information and provided a link to the Medication Guide and Prescribing Information. However, NAION and permanent vision loss were not identified as risks.

## II.    Marketing and Promotion Create a Media Frenzy and Mega Seller for Novo Nordisk

39.    Since Novo Nordisk discovered GLP-1 agonists potential use for weight loss, Defendant Novo Nordisk began working to change medical consensus as it relates to obesity.

40.    Throughout their marketing, Defendant Novo Nordisk fails to disclose the true serious side effects of Ozempic, such as permanent vision loss.

---

[19] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on Feb. 13, 2025).

[20] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited Feb. 13, 2025).

[21] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited Feb. 13, 2025).

[22] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited Feb. 13, 2025).

41.     When the Defendant Novo Nordisk announced that they had started selling Ozempic in the United States, they touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."

42.     Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[23] but Novo Nordisk had already begun mentioning weight loss in their Ozempic commercials.[24]

43.     On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic with the catchy jingle to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Defendant Novo Nordisk advertised that "adults lost on average up to 12 pounds" when taking Ozempic.[25]

44.     Over the next five years, Novo Nordisk spent 884,000,000 million dollars on running television ads in the United States to promote its semaglutide Ozempic, Wegovy, and Rybelsus, with most advertisements allocated towards Ozempic.[26]

45.     Defendant Novo Nordisk's aggressive marketing includes a number of different platforms, including over 4,000 marketing advertisements for Ozempic and similar weight-loss medications that have been placed on Facebook and Instagram.[27]

46.     As a result of this heavy focus on direct-to-consumer advertising, many patients specifically sought out prescriptions for Ozempic.

---

[23] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy html (last visited Feb. 13, 2025).
[24] Id.
[25] https://www.ispot.tv/ad/d6Xz/ozempic-oh (last visited Feb. 13, 2025).
[26] https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited Feb. 13, 2025).
[27] https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (last visited Feb. 13, 2025).

47.     According to open payments data, Novo Nordisk spent $33,927,336.42 on marketing/consulting/travel/food and beverage/etc. to physicians in 2022 alone.[28]

48.     Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns. One diabetes marketing campaign achieved a dramatic 28% direct engagement rate with their polls.[29]

49.     On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[30]

50.     Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic in 2022. [31] Ozempic ranked as the sixth most-advertised prescription drug brand in 2022, with a U.S. measured-media spend of $181 million, according to Vivvix spending data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[32]

51.     In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic.[33]

52.     Defendant Novo Nordisk also owns and operates several marketing campaign websites that are created for the purposes of educating on the science of obesity and creating a change in how obesity is understood and treated.

53.     This includes the website "The Truth about Weight."[34]

---

[28] *https*://openpaymentsdata.cms.gov/company/100000000144 (last visited Feb. 13, 2025).

[29] https://business.instagram.com/success/novo-nordisk (last visited Feb. 13, 2025).

[30] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on Feb. 13, 2025).

[31] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Feb. 13, 2025).

[32] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571?utm_source=exchange&utm_medium=email&utm_campaign=t5687390 (last visited Feb. 13, 2025).

[33] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/ (last visited Feb. 13, 2025)

[34] Truth About Weight,https://www.truthaboutweight.com/ (last visited on Feb. 13, 2025).

54. Defendant Novo Nordisk has also spent significant resources aligning themselves and infiltrating their influence into physician and advocacy groups.

55. This includes the American Board of Obesity Medicine. The former Director of the American Board of Obesity Medicine who served from 2017 to November of 2021 received payments by Novo Nordisk during her time as director of the American Board of Obesity Medicine.[35]

56. This former director of the American Board of Obesity Medicine currently promotes their GLP-1 agonists for weight loss as part of their telehealth company and continues to receive payments.[36]

57. At least one member of the American Board of Obesity Medicine that helped write the guidelines for obesity management has received payments directly from Novo Nordisk according to Open Payments Data during the same time he wrote those guidelines.[37]

58. Novo Nordisk contributes money directly to education courses used to satisfy continuing education requirements or to prepare for certification in obesity medicine.[38]

59. Novo Nordisk serves on the board and/or provides direct financial contributions to many public health advocacy groups.

---

[35]https://joinfound.com/pages/medication-biology (last visited on Feb. 14, 2025);
https://openpaymentsdata.cms.gov/physician/1294300 (last visited Feb 14. 2025);
https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited on Feb. 14, 2025).
[36]https://joinfound.com/pages/medication-biology (last visited on Feb. 14,
2025);https://openpaymentsdata.cms.gov/physician/1294300 (last visited on Feb. 14, 2025);
https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited on Feb. 14, 2025).
[37]https://openpaymentsdata.cms.gov/physician/1379381 (last visited Feb. 14, 2025); see also
https://www.abom.org/karl-nadolsky/.
[38] *Id.*

60.      This includes Obesity in Action Coalition, to which Novo Nordisk contributes more than $500,000 annually.[39] Novo Nordisk has been a partner since 2013, before any of its drugs were approved for weight loss.

61.      Novo Nordisk also serves on the Corporate Council of American Society for Metabolic and Bariatric Society, another public health partner of the American Board of Obesity Medicine.[40]

62.      Novo Nordisk is also a corporate member and directly financially contributes to Stop Obesity Alliance, yet another public health partner of the American Board of Obesity Medicine.[41]

63.      Novo Nordisk is a member of additional advocacy organizations and lobbying groups separate and apart from these public health partners of the American Board of Obesity Medicine.

64.      This includes the Obesity Care Advocacy Network, which lobbies for legislation to expand access to Novo Nordisk's drugs.[42]

65.      Defendant Novo Nordisk has deceptively promoted their weight loss drugs on television and news segments.

66.      For example, Novo Nordisk's drugs were the subject of an investigative report on 60 Minutes that aired New Year's Day of 2023.[43]

---

[39] https://www.obesityaction.org/corporate-partners/ (last accessed Feb. 14, 2025).
[40] https://asmbs.org/corporate-council (last visited Feb. 14, 2025).
[41] https://stop.publichealth.gwu.edu/membership (last visited on Feb. 14, 2025).
[42] https://assets.obesitycareadvocacynetwork.com/TROA_fact_sheet_11_12_21_48098432e0/TROA_fact_sheet_11_12_21_48098432e0.pdf (last visited on Feb. 14, 2025)
[43] https://www.cbsnews.com/news/wegozy-ozempic-explainer-60-minutes-2023-01-01/ (last visited Feb. 14, 2025).

67.     Complaints have been filed alleging that the "news" piece was in reality "deceptive marketing" in which all physicians interviewed had received payments by Novo Nordisk. [44]

68.     The financial relationship between the physicians speaking about Ozempic and Novo Nordisk was not explicitly disclosed.[45] The reporter stated that the physicians had *advised* Novo Nordisk but failed to state they had been compensated by the company.[46]

69.     The FDA is currently investigating the marketing practices of Novo Nordisk.[47]

70.     Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

71.     For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data. [48]

72.     Defendant Novo Nordisk has directly and indirectly partnered with telehealth providers to promote their weight loss drugs.

73.     This includes a 2019 direct partnership between Novo Nordisk and Noom, a leading behavior weight loss company.[49]

74.     In 2021, Novo Holdings participated in a $540 million round of financing with Noom.[50] At that time, Novo Holdings tweeted that it "is pleased to note that it has participated in the $540 million Series F round in @noom, a leading digital health platform…".[51]

---

[44] https://www.fiercepharma.com/marketing/health-group-lambasts-novo-nordisk-60-minutes-paid-news-program-weight-loss-med-wegovy (last visited Feb. 14, 2025).

[45]  https://fair.org/home/60-minutes-weight-loss-tip-dont-bite-the-hand-that-feeds-you/ (last visited on Feb. 14, 2025).

[46] *Id*.

[47] https://www.pcrm.org/news/news-releases/fda-confirms-investigation-novo-nordisk-ad-posited-60-minutes-story-about-weight (last visited Feb. 14, 2025)

[48] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Feb. 14, 2025)

[49] https://www.prnewswire.com/in/news-releases/novo-nordisk-and-noom-to-partner-around-digital-health-solutions-to-help-people-with-obesity-lose-weight-and-keep-it-off-811725389.html (last visited on Feb. 14, 2025).

[50] https://www.businesswire.com/news/home/20210525005492/en/Noom-Announces-540-Million-in-Growth-Funding-to-Further-Accelerate-Expansion-of-its-Digital-Health-Platform

[51] https://twitter.com/novoholdings/status/1397170264702599171

75.    Novo Holdings currently lists on its website that is has "venture investments" in Noom.[52]

76.    Noom Med now provides to consumers, using physicians hired by Noom, prescriptions for weight loss directly to patients.[53]

77.    Noom Med promotes off label usage of these weight loss drugs on its website.[54]

78.    Noom currently has over 45 million users.[55]

79.    Other telehealth providers have jumped on board the bandwagon in offering prescriptions directly to consumers for Defendant's weight-loss medications.

80.    This includes Weight Watchers, who purchased telehealth startup Sequence for $132,000,000 in order to provide weight loss medications to its subscribers.[56]

81.    There are currently over 3.5 million Weight Watchers subscribers.[57]

82.    It also includes Calibrate, yet another telehealth provider for weight loss medications, which raised $100 million in capital funding from investors in 2021.

83.    Collectively, the telehealth providers that Novo Nordisk directly and indirectly partners with and/or promotes account for approximately half of all weight loss prescriptions in 2022.[58]

84.    In sum, Defendant Novo Nordisk promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations,

---

[52] https://novoholdings.dk/investments/noom/
[53] https://abcnews.go.com/GMA/Wellness/noom-joins-weight-watchers-offering-medications-wegovy-weight/story?id=99841160 (last visited on Feb. 14, 2025).
[54] Nhttps://www.noom.com/med/ (last visited on Feb. 14, 2025).
[55] https://exitsandoutcomes.com/free-excerpt-from-the-noom-report-a-45-million-moat/ (Feb. 14, 2025).
[56] https://www.usatoday.com/story/news/health/2023/03/07/weightwatchers-sequence-wegovy-obesity-weight-loss-drugs/11415201002/ (last visited on Feb. 14, 2025).
[57] https://finance.yahoo.com/news/ww-international-inc-announces-first-200100340.html#:~:text=%E2%80%9CWe%20expect%20to%20end%202023,including%203.5%20million%20WeightWatchers%20subscribers (last visited on Feb. 14, 2025).
[58] https://www.statnews.com/2023/08/10/wegovy-ozempic-weight-loss-telehealth-prescriptions/

14

through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

85.  Novo Nordisk's comprehensive, immersive marketing has left no stone unturned in delivering their message that physicians and patients must use their drugs to treat obesity.

**III.  Marketing Works: Defendant Novo Nordisk's Rampant Promotion Results in Thousands of Prescriptions and Billions in Sales**

86.  As a result of Defendant Novo Nordisk's all-encompassing advertising and promotion efforts, Ozempic are widely prescribed throughout the United States.

87.  In July of 2021, doctors in the US wrote 62,000 prescriptions a week for Ozempic.[59]

88.  It has been reported that the huge demand created by extensive marketing has led to rampant off-label usage and "gaming" the system to allow for insurance coverage.[60]

89.  The number of prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.[61]

90.  In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[62]

91.  As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% in the U.S. to more than $3.7 billion.[63]

**IV.  The Development and Approval of Mounjaro**

---

[59]  https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited on Feb. 14, 2025)

[60]  *Id.*

[61]  https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktok-telehealth/ (last visited on Feb. 14, 2025).

[62]  https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited on Feb. 14, 2025).

[63]  https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html#:~:text=Novo%20traded%20earnings%20jabs%20with,to%20more%20than%20%243.7%20billion. (last visited Feb. 14, 2025).

92.     Following the success of Novo Nordisk's Ozempic, scientists and other pharmaceutical companies began exploring the possibilities of combining GLP-1s with other compounds.

93.     In the early 2010s, a team of scientists at Indiana University created tirzepatide, Mounjaro's active ingredient, by combining GLP-1 and GIP into single molecules. [64]

94.     GIP stands for glucose-dependent insulinotropic polypeptide. It is a natural hormone that works alongside GLP-1 to help control blood sugar and promote weight loss by signaling the pancreas to release insulin, slow stomach emptying, and increase feelings of fullness.[65]

95.     In pre-clinical trials, obese rats given tirzepatide were observed to decrease their food intake, decrease their body weight and improve their glucose tolerance. [66]

96.     Rats given tirzepatide were more likely to develop thyroid C-cell tumors. The offspring of pregnant rats given tirzepatide had fetal abnormalities. [67]

97.     From 2018 to 2021 Eli Lilly conducted clinical trials collectively known as SURPASS. [68]

---

[64] https://newatlas.com/triple-agonist-peptide-diabetes-obesity/35180/#:~:text=In%202012%2C%20we%20covered%20work%20led%20by,held%20promise%20as%20a%20treatment%20for%20obesity (last visited on Dec. 15, 2025).

[65] https://phelpshealth.org/news/featured-stories/understanding-mounjaro-guide-type-2-diabetes-patients#:~:text=A%20delicate%20balance:%20Glucagon%20is,the%20pancreas%20to%20release%20insulin (last visited on Dec. 15, 2025)

[66] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000PharmR.pdf (last visited on Dec. 15, 2025)

[67] https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/215866s000lbl.pdf (last visited on Dec. 15, 2025)

[68] https://diabetes.org/newsroom/latest-data-from-SURPASS-trials-demonstrate-tirzepatide-provided-blood-sugar-reductions-weight-loss#:~:text=Blood%20Sugar%20Reductions-,Latest%20Data%20From%20SURPASS%20Trials%20Demonstrate%20Tirzepatide%20Provided%20Meaningful%20Blood,with%20a%20test%20called%20A1C (last visited on Dec. 15, 2025)

98.    From 2019 to 2023, Eli Lilly conducted five additional clinical trials collectively known as SURMOUNT to test the effectiveness, safety, and long-term benefits of tirzepatide for chronic weight management in adults with obesity. [69]

99.    The final trial, SURMOUNT-5, compared tirzepatide to Wegovy.[70]

100.    Eli Lilly was already testing the drug's effectiveness for chronic weight management before it had been approved for Type 2 diabetes. Eli Lilly submitted a new drug application (NDA 215866) for tirzepatide under their brand name Mounjaro on September 15, 2021. [71]

101.    The FDA approved Mounjaro on May 13, 2022 for the regulation of type 2 diabetes.[72]

102.    Eli Lilly continues to be the holder of the NDA and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label.

103.    The FDA's approval was based on the first nine SURPASS and SURMOUNT trials.[73]

104.    In a news release dated May 13th, 2022, Eli Lilly reported that "While not indicated for weight loss, Mounjaro led to significantly greater weight reductions versus comparators in a key secondary endpoint." [74]

---

[69] https://www.lilly.com/en-CA/news/press-releases/2024.12.4-tirzepatide-surmount-5-h2h
[70] *Id.*
[71] https://www.govinfo.gov/content/pkg/FR-2024-02-29/html/2024-04157 htm (last visited on Dec. 15, 2025)
[72] https://www.fda.gov/drugs/drug-approvals-and-databases/drug-trials-snapshots-mounjaro#:~:text=MOUNJARO%20(tirzepatide),How%20is%20this%20drug%20used (last visited on Dec. 15, 2025)
[73] *Id.*
[74] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)

105.    In a news release dated October 6th, 2022, the president of Lilly Diabetes, Mike Mason, stated "[o]besity is a chronic disease that impacts the health of nearly 100 million Americans and is a significant driver of healthcare costs… we are dedicated to helping people living with obesity through our research and development of innovative treatments like tirzepatide, which produced significant weight reductions in patients taking tirzepatide for type 2 diabetes in SURPASS." [75]

106.    Eli Lilly acknowledges that Mounjaro is not a weight loss medication but simultaneously advertised its weight loss capabilities before the active ingredient, tirzepatide, was approved for chronic weight management by the FDA. [76]

107.    On October 6th, 2022, the FDA granted Fast Track designation for the investigation of tirzepatide for the treatment of obese adults or overweight adults with weight-related comorbidities. [77]

108.    On November 17th, 2022, Eli Lilly and Co. initiated a rolling submission for their Zepbound NDA (NDA 217806). **[78]**

109.    The FDA dated and received the NDA on May 8th, 2023. [79]

110.    The FDA approved tirzepatide under Eli Lilly's brand name Zepbound on November 8th, 2023 for chronic weight management in adults with obesity or adults who are overweight with at least one weight-related condition. [80]

---

[75] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)

[76] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)

[77] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)

[78] *Id.*

[79] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/217806Orig1s000ltr.pdf (last visited on Dec. 15, 2025)

[80] FDA Approves New Medication for Chronic Weight Management | FDA (last visited on Dec. 15, 2025)

111. According to a November 19th, 2025 summary of risk management plan released by Eli Lilly, patients with a history of proliferative diabetic retinopathy, nonproliferative diabetic retinopathy, and diabetic maculopathy were excluded from the tirzepatide clinical trial development program. [81]

112. On their website, Defendant Eli Lilly does disclose important safety information and provides a link to their medication guide and prescribing information. However, Defendant Eli Lilly does not specify NAION or permanent vision loss as a risk when taking tirzepatide for either diabetes management or weight management. [82]

### V. Eli Lilly Aggressively Marketed and Promoted Mounjaro

113. Eli Lilly launched a digital campaign for Mounjaro in January of 2023. [83]

114. On February 12, 2023, the same day as the SuperBowl LVII, Defendant Eli Lilly aired a 75-second advertisement for Mounjaro on FOX titled "What If?". [84]

115. This advertisement kicked off a commercial campaign that included at least seven other commercials, two of which featured Olympic athlete Simone Biles. [85] [86]

---

[81] file:///C:/Users/avillarreal/Downloads/tirzepatide_MounjaroRMPsummary_v1point0%20(1).pdf (last visited on Dec. 15, 2025)

[82] https://mounjaro.lilly.com/how-to-use-mounjaro?gclsrc=aw.ds&gad_source=1&gad_campaignid=23012920200&gbraid=0AAAAAoh_8M_T4v4msb1HY-OSnC7n5uqu4&gclid=EAIaIQobChMIvby4gdq4kQMVT0tHAR0fTAUgEAAYASAAEgLp4_D_BwE (last visited on Dec. 15, 2025)

[83] https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/#:~:text=Mounjaro%20received%20US%20Food%20and,FDA's%20fast%20track%20approval%20pathway (last visited on Dec. 15, 2025)

[84] https://www.ispot.tv/ad/1VpJ/mounjaro-what-if#:~:text=More%20Mounjaro%20Commercials-,Mounjaro%20TV%20Spot%2C%20'I%20See%20You'%20Featuring%20Simone%20Biles,Mounjaro%20TV%20Spot%2C%20'Bridge (last visited on Dec. 15, 2025)

[85] https://www.ispot.tv/ad/BkSt/mounjaro-i-see-you-featuring-simone-biles (last visited on Dec. 15, 2025)

[86] https://www.ispot.tv/ad/6mcG/mounjaro-olympics-working-hard-featuring-simone-biles (last visited on Dec. 15, 2025)

116.    In March of 2023, Eli Lilly spent $21.4 million on Mounjaro TV advertisements, placing it in the top five of pharmaceutical companies who spent the most on TV advertisements for that month. [87]

117.    An advertisement aired as part of their "What If" series, indicated that "Mounjaro is not a weight loss drug" in small font at the bottom of the screen, but also clearly indicated that Mounjaro can help decrease how much food you eat. [88]

118.    In May of 2025, Eli Lilly launched a marketing campaign titled "Duets for Type 2 Diabetes" featuring *Modern Family* actor Eric Stonestreet. [89]

119.    As part of their paid partnership, a promotional video was released on May 2nd, 2025 featuring the actor and his mother who both have Type 2 diabetes and take Mounjaro. [90]

120.    In this video, Eric Stonestreet referred to Mounjaro as a "teammate" that helped him manage his type 2 diabetes and related symptoms. [91]

121.    Stonestreet also stated that they participated in the paid partnership because they wanted to inspire others to talk to their doctors about Mounjaro. [92]

122.    On April 11, 2023, the New York Times reported that some research has found that "Mounjaro may be even more powerful than either Ozempic or Wegovy." It also reported that "many people [are] using it off-label to lose weight." [93]

---

[87] https://www.fiercepharma.com/marketing/eli-lillys-new-tv-spot-diabetes-med-mounjaro-leaps-top-dtc-ad-spenders-list (last visited on Dec. 15, 2025)
[88] https://www.ispot.tv/ad/fWgz/mounjaro-what-if (last visited on Dec. 15, 2025)
[89] https://mounjaro.lilly.com/duets (last visited on Dec. 15, 2025)
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes.html (last visited on Dec. 15, 2025)

123.    Although a representative from Eli Lilly denied promoting or encouraging "the off-label use of any of [their] medicines," Eli Lilly was clearly interested in using tirzepetide for chronic weight management. [94]

124.    In March 18th of 2024, Oprah Winfrey hosted a television special titled "An Oprah Special: Shame, Blame, and the Weight Loss Revolution" where she was joined by representatives from Eli Lilly and Novo Nordisk who discussed their respective weight loss medications. [95]

125.    This special featured Dr. W. Scott Butsch and Dr. Amanda Velazquez who are both paid consultants and have received research funding from Eli Lilly. The video also features Rhonda Pacheco, Group Vice President of Diabetes and Obesity for Eli Lilly. [96]

126.    Subsequently, the FDA issued a warning letter to both Defendants for their misleading drug advertisements determining that the media was false or misleading. [97]

127.    In the letter, the FDA claimed that both Defendants discussed the benefits of their medications while omitting or understating the risks associated with these medications and the warnings associated with each drug. [98]

128.    In early 2024, Eli Lilly launched a campaign titled "Get Better" with a new focus on obesity. [99]

---

[94] *Id.*

[95] https://www.fiercepharma.com/marketing/oprah-shines-her-star-power-glp-1s-new-weight-loss-drugs-tv-special#:~:text=When%20Winfrey%20asked%20why%20coverage,ABC%20to%20support%20the%20broadcast (last visited on Dec. 15, 2025)

[96] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/eli-lilly-and-company-716485-09092025 (last visited on Dec. 15, 2025)

[97] *Id.*

[98] https://www.pharmexec.com/view/fda-warning-letters-novo-nordisk-eli-lilly-hims-regarding-misleading-advertising (last visited on Dec. 15, 2025)

[99]  https://investor.lilly.com/news-releases/news-release-details/lillys-newest-phase-get-better-campaign-challenges (last visited on Dec. 15, 2025)

129. They aired two films showcasing their "point of view around obesity—emphasizing [their] commitment to patients by highlighting the seriousness of this disease and the appropriate use of anti-obesity medicines." [100]

130. The second film, titled "Big Night" was released in March of 2024 during the Oscars. [101]

131. They have also invested in a branding campaign titled "A Medicine Company" intended to strengthen Eli Lilly's brand as a company that values "health above all" and as a pharmaceutical company that can be trusted. [102]

132. Lina Polimeni, chief corporate brand officer at Eli Lilly stated "[p]eople understand Lily as a manufacturer of medicine, but don't always understand Lilly as a company or as a brand." Also, "[t]here's a big effort happening right now in building a brand that people love and trust — one that explains why we make medicine for people and tackle diseases that are so hard to treat."[103]

133. According to open payments data, Eli Lilly spent $7,745,971.25 on marketing/consulting/travel/food and beverage/etc. to physicians or medical institutions in 2024 alone. [104]

134. In 2023, they spent $6,136,076.18 on the same. [105]

135. Eli Lilly has spent money on grants to various hospitals like the Tufts Medical Center to whom they gave $250 million dollars. [106]

---

[100] *Id.*
[101] https://www.youtube.com/watch?v=lZ3Dt74R4ak, https://www.youtube.com/watch?v=zQWk-Q3tmkE (last visited on Dec. 15, 2025)
[102] https://www.adweek.com/brand-marketing/eli-lillys-big-task-become-a-loved-and-trusted-pharma-brand/ (last visited on Dec. 15, 2025)
[103] https://www.campaignlive.com/article/lilly-building-brand-people-trust/1893652 (last visited on Dec. 15, 2025)
[104] https://openpaymentsdata.cms.gov/company/100000000088 (last visited on Dec. 15, 2025)
[105] *Id.*
[106] *Id.*

136.   By the end of 2022, Mounjaro had sales of $482.5 million. In 2023, its first full year on the market, Mounjaro brought in nearly $5.2 billion. [107]

137.   On December 18th, 2023 Global Data reported that based on clinical data, sales for Mounjaro are forecasted at $27 billion by 2029. [108]

138.   In 2024, Mounjaro was rated the ninth most sold drug, generating $11,540,100,000 dollars in sales. [109]

139.   Eli Lilly spent approximately $8,593,800,000 dollars on marketing, selling, and administrative expenses in 2024. [110]

140.   They spent $7,403,100,000 dollars on the same in 2023. [111]

141.   By the second quarter of 2025, Mounjaro had surpassed Ozempic in sales at over $5 million. [112]

142.   Mounjaro has experienced the highest monthly gross sales post-launch compared to some other GLP-1 RAs including Ozempic. As of September 13th, 2025, Mounjaro was producing around $3 billion a month for Eli Lilly. [113]

143.   A November 6, 2025 article published in the scientific journal *Nature* stated that tirzepatide was on track to be the top selling drug in the world in 2025. [114] [115]

---

[107] https://www.pewresearch.org/short-reads/2024/03/21/as-obesity-rates-rise-in-the-us-and-worldwide-new-weight-loss-drugs-surge-in-popularity/ (last visited on Dec. 15, 2025)

[108] https://www.globaldata.com/media/pharma/obesity-drug-mounjaro-to-surpass-ozempic-with-27-billion-sales-in-2029-forecasts-globaldata/ (last visited on Dec. 15, 2025)

[109] https://www.drugdiscoverytrends.com/2024s-blockbusters-top-50-pharmaceuticals-by-sales/ (last visited on Dec. 15, 2025)

[110] https://www.statista.com/statistics/517713/eli-lilly-marketing-expenses/?srsltid=AfmBOooh4INZhImNQmWYuAN77jRyz_imlJeTdp6nMNFxZxJlCzXDDPgH (last visited on Dec. 15, 2025)

[111] Id.

[112] https://www.drugdiscoverytrends.com/top-25-drugs-by-sales-2025-h1/ (last visited on Dec. 15, 2025)

[113] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)

[114] https://www.nytimes.com/2025/11/21/health/eli-lilly-one-trillion-value-pharmaceuticals.html (last visited on Dec. 15, 2025)

[115] https://www.nature.com/articles/d41573-025-00183-y (last visited on Dec. 15, 2025)

144.    Eli Lilly serves on the board and/or provides direct financial contributions to many public health advocacy groups, including the Obesity Action Coalition. [116]

145.    Eli Lilly and Novo Nordisk are members of the Obesity Medicine Association's Corporate Council. [117]

146.    They are platinum members of this council, meaning they contribute more than $100,000 annually to the coalition's general operating efforts. [118]

147.    Eli Lilly has been a contributing supporter to the coalition since 2020, before any of its drugs were approved for weight loss. [119]

148.    In sum, Defendant Eli Lilly promoted the safety, efficacy, and sale of Mounjaro in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets and has never disclosed NAION resulting in permanent vision loss as a risk of the medication.

149.    On May 24th, 2024 the Wall Street Journal reported that Eli Lilly spent $5.3 billion to boost manufacturing capacity for Zepbound and Mounjaro to ease shortages of the drugs. They referred to this investment as the "largest manufacturing investment in company history." [120]

150.    Eli Lilly has integrated with numerous other telehealth companies like Noom to provide their weight loss medications to consumers. [121]

---

[116] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)
[117] https://obesitymedicine.org/resources/vendor-directory/ (last visited on Dec. 15, 2025)
[118] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)
[119] *Id.*
[120] https://www.wsj.com/health/pharma/eli-lilly-boost-supply-mounjaro-zepbound-weight-loss-drugs-d7060ef2?gaa_at=eafs&gaa_n=AWEtsqdNL_RPuCMGNGxal7XO8X0aJVT9G4xcB5jz9Yr3L1CJIzAf7D_JXWXO&gaa_ts=693c66db&gaa_sig=dx015W7HoeMCEOSZjtohKvIc-GkaYbXZO4wA9R9OtaeXQvezsUnWJOM5LQeLSitjn0A6BiJOYhYPR61lLGJevQ%3D%3D (last visited on Dec. 15, 2025)
[121] https://www.noom.com/in-the-news/noom-to-streamline-access-to-zepbound-vials-with-noom-glp-1-companion-

**VI.    Marketing Works: Eli Lilly's Rampant Promotion Resulted in Thousands of Prescriptions and Billions in Sales.**

151.    As a result of Defendant Eli Lilly's all-encompassing advertising and promotion efforts, Mounjaro is widely prescribed throughout the United States.

152.    Millions of Americans have been prescribed Mounjaro since its 2022 FDA approval, though exact prescription rates or current user numbers are unavailable due to discontinuations and access barriers. [122]

153.    By 2023, the rate of Mounjaro prescribing had increased by 0.4% from the previous year and by 2024 it increased by 0.8%. [123]

154.    By 2023, semaglutide and Mounjaro made up 70% of all spending done by Americans on GLP-1 RAs. [124]

155.    Following the approval of Zepbound, tirzepatide prescriptions increased from 1.1 million to 1.4 million monthly prescriptions by February 2024. [125]

156.    During December 2024, overall prescribing rates of anti-obesity medication was highest for tirzepatide. [126]

157.    A 2024 study estimated that Mounjaro's use grew by more than 250% each month in its first year of release, despite only being available for seven out of 12 months that year. [127]

---

through-integration-with-lillydirect-pharmacy-provider/?srsltid=AfmBOopZtRpDqDtHAkAvdIhz2i5v-GhSGkaLJWMWQuDZCDL-Jy-VNnNh (last visited on Dec. 15, 2025)

[122] https://www fellahealth.com/guide/how-many-people-are-on-tirzepatide#:~:text=11,to%20discontinuations%20and%20access%20barriers (last visited on Dec. 15, 2025)

[123] https://www.truveta.com/blog/research/glp1-prescription-trends-december-2024#:~:text=%2C%20or%20unknown).-,Overall%20prescribing%20trends,semaglutide%20(sold%20as%20Wegovy) (last visited on Dec. 15, 2025)

[124] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2832114 (last visited on Dec. 15, 2025)

[125] https://pmc ncbi.nlm nih.gov/articles/PMC11780480/ (last visited on Dec. 15, 2025)

[126] https://www.medrxiv.org/content/10.1101/2025.03.06.25323524v1 (last visited on Dec. 15, 2025)

[127] https://www.singlecare.com/blog/news/mounjaro-statistics-2025/ (last visited on Dec. 15, 2025)

158.    Just three years post-launch, Mounjaro reached an average of 9 patients per provider.[128]

159.    Since 2022 the amount of providers prescribing Mounjaro and the ratio of prescribed patients to prescribers has been increasing steadily. [129]

**VII.    Use of Ozempic and Mounjaro has been linked to the development of NAION**

160.    The Defendants Novo Nordisk and Eli Lilly knew or should have known of the risk of NAION with use of their respective drugs Ozempic and Mounjaro.

161.    Defendants conduct clinical trials and have access to case reports and medical literature that provide them with superior knowledge compared to the general public as to the potential risks of their medications.

162.    For example, in a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[130]

163.    The event occurred within the Semaglutide 2.0 mg dosage group which included 479 participants which is significant given the low background incidence of NAION.[131]

164.    Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

165.    It falls within the category of an eye stroke.

---

[128] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)
[129] *Id.*
[130] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. Accessed February 18, 2025.
[131] *Id.*

166.   While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

167.   "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[132]

168.   Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.[133]

169.   Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.[134]

170.   The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.[135]

171.   Unfortunately, there is no effective treatment for NAION. Vision may worsen in the four weeks following the event. Some patients may see modest improvement in their vision, but complete recovery of vision is unusual.[136]

172.   Some NAION patients lose complete vision with no recovery in affected eye(s).

---

[132] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management

[133] Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION). American Academy of Ophthalmology, EyeWiki. https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION). Accessed February 18, 2025.

[134] Id.

[135] Id.

[136] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management

173.    Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blinded in one eye and certainly both eyes results in bumps and falls and injuries related to the unseen impacts and accidents.

174.    GLP-1 receptors have been detected in neuronal cells in the human eye.[137]

175.    Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

176.    The study "Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide" authored by Hathaway *et al.* involved patients examined in the neuro-ophthalmology clinic between December 1, 2017 and November 30, 2023 and consisted of 17,298 patients including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D) and 979 were overweight or obese.[138]

177.    Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[139]

178.    Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[140]

---

[137] Hebsgaard JB, Pyke C, Yildirim E, Knudsen LB, Heegaard S, Kvist PH. Glucagon-like peptide-1 receptor expression in the human eye. *Diabetes Obes Metab*. 2018; **20**(9): 2304-2308. doi:10.1111/dom.13339
[138] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296
[139] *Id.*
[140] *Id.*

179.    Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; *P* < .001; concordance coefficient = 0.84).[141]

180.    Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[142]

181.    The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[143]

182.    Acknowledging the pathogenesis or cause of NAION remains unknown, the authors did not determine the mechanism in which semaglutide causes NAION, however, it was

---

[141] *Id.*
[142] *Id.*
[143] *Id.*

hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[144]

183.    A metanalysis of all clinical trials of GLP-1 receptor drugs, including Novo's own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[145] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading a lower estimated risk.[146] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[147]

184.    On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and

185.    risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[148]

186.    This cohort study compared the risk of NAION among individuals with type 2

187.    diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication.[149] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[150]

---

[144] *Id.*

[145] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076

[146] *Id.*

[147] *Id.*

[148] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574

[149] *Id.*

[150] *Id.*

188.    In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018 and December 31, 2023,[151] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[152]

189.    "Exposure to once-weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[153]

190.    The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[154]

191.    Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[155]

192.    Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION and that the PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[156]

193.    In response, Novo Nordisk has acknowledged confirmed cases of NAION were identified within their clinical trials.[157]

---

[151] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/

[157] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness

194.    A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[158]

195.    The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[159]

196.    The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling, and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she then experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

197.    The same article includes reports of three patients who developed NAION following tirzepatide use.[160]

198.    The first case involved a man in his sixties reporting a painless shade in the superior field of his left eye after using tirzepatide injections for a year. He was diagnosed with NAION after thorough testing to rule out other conditions.[161]

199.    The second case involved a man in his sixties who experienced painless vision loss in his left eye upon awakening. He had been taking tirzepatide for a year when his dose was

---

[158] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol.* Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[159] *Id.*
[160] *Id.*
[161] *Id.*

increased to 10 mg of tirzepatide weekly. His vision loss occurred 4 months after this dosage increase and he was diagnosed with NAION. [162]

200.    The third case involved a woman in her fifties who experienced painless vision loss in her left eye upon awakening 5 months after she started tirzepatide. She was diagnosed with NAION.[163]

201.    On August 11th, 2025 a cohort study was conducted and published in *JAMA*. This study aimed to determine if using semaglutide or tirzepatide was associated with an increased risk of NAION and other optic nerve or visual pathway disorders. [164]

202.    The study was conducted with population of 159,398 patients with Type 2 diabetes, including 79,699 patients taking semaglutide or tirzepatide and a comparison group containing the same amount of patients taking other antidiabetic medications. [165]

203.    When researchers followed up with patients in two years, 35 patients (0.04%) who were taking semaglutide or tirzepatide developed NAION compared to 19 patients (0.02%) who developed NAION in the comparison group. The study found that treatment with semaglutide or tirzepatide was associated with an increased risk of optic nerve disorders, including NAION. [166]

204.    On June 6, 2025, the European Medicines Agency (EMA) determined the product information of semaglutide should be updated to include the risk of NAION with a warning to

---

[162] *Id.*
[163] *Id.*
[164] Wang, Lindsey, Volkow, MD, Nora D., Kaelber David C., MD, PhD, MPH, Xu, Rong PhD. Semaglutide or Tirzepatide and Optic Nerve and Visual Pathway Disorders in Type 2 Diabetes. *JAMA Ophthalmol.* Published online August 11, 2025. doi:10.1001/jamanetworkopen.2025.26327.
[165] *Id.*
[166] *Id.*

patients that upon sudden vision loss or worsening vision, a physician should be contacted right away and the medication should be stopped if NAION is confirmed.[167]

205.    As of September 30, 2025, Section 4.4 of the labeling for Ozempic and Wegovy sold in Europe, "Special warnings and precautions for use," has been updated to state the following, "Data from epidemiological studies indicates an increased risk for non-arteritic anterior ischemic optic neuropathy (NAION) during treatment with semaglutide. There is no identified time interval for when NAION may develop following treatment start. A sudden loss of vision should lead to ophthalmological examination and treatment with semaglutide should be discontinued if NAION is confirmed."[168]

206.    Section 4.8 of the European label of Ozempic, "Undesirable effects," now warns of an "approximately two-fold increase in the relative risk of developing NAION, corresponding to approximately one additional case per 10 000 person-years of treatment."[169]

207.    Patients taking Ozempic or Wegovy in Europe are also now directly warned of the risk of NAION in the Package leaflet: Information for the patient.[170]

208.    Despite these changes to the European labeling, no such warnings exist on Ozempic or Wegovy prescriptions sold in the United States.

209.    The medical community is continuing to study whether use of GLP-1 RA medications carry a heightened risk of NAION. As stated by the FDA, "[g]iven the severe and irreversible nature of NAION and the growing popularity of GLP-1 RA, we aim to evaluate the

---

[167] European Medicines Agency, PRAC concludes eye condition NAION is a very rare side effect of semaglutide medicines Ozempic, Rybelsus and Wegovy (June 6, 2025), https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy

[168] European Medicines Agency, Product Information, Ozempic, https://www.ema.europa.eu/en/documents/product-information/ozempic-epar-product-information_en.pdf (Last visited October 21, 2025).

[169] *Id.*

[170] *Id.*

previously observed safety signal with respect to NAION using a principled approach to study design and analysis," the agency has commissioned a non-randomized cohort study analyzing insurance claims data from the FDA Sentinel System's Real-World Evidence Data Enterprise (RWE-DE) Commercial Network (HealthVerity).[171]

210.    The study is ongoing and includes patients exposed to GLP-1RA medications indicated for treatment of Type 2 Diabetes, including Rybelsus, Ozempic and Mounjaro.[172]

### VIII.    Defendants Continue to Fail to Disclose the Risk of NAION

211.    According to the Drugs@FDA website, the label for Ozempic has been updated on at least thirteen (13) occasions since 2017, with the most recent update on January 28, 2025.[173] Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Novo Nordisk's labels have not contained any warning or any information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

212.    According to the Drugs@FDA website, the label for Mounjaro has been updated on at least twelve (12) different occasions since 2022, with the most recent update on September 25, 2025. Despite this fact, Eli Lilly's labels have not contained any warning or any information whatsoever on the increased propensity of Mounjaro to cause NAION and permanent vision loss as suffered by Plaintiff. [174]

213.    To date, both warning labels are still devoid of any mention of NAION.

---

[171] https://www.sentinelinitiative.org/sites/default/files/documents/Risk-of-NAION-Following-GLP-1-Receptor-Agonist-Use-in-Patients-with-Type-2-Diabetes-Mellitus_v3.0_vF.pdf (last visited on Dec. 15, 2025)
[172] *Id.*
[173] *See* Drugs@FDA: FDA-Approved Drugs, Ozempic, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (last visited February 19, 2025).
[174] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215866 (last visited on Dec. 15, 2025)

214.   Furthermore, Defendants have failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Rybelsus, Ozempic and Mounjaro, monitoring of patients while on the medication, and advising patients to cease use of the medication if they develop symptoms consistent with NAION or after the fact as to not risk the potential for injury in the other eye.

215.   Nothing was or is stopping Defendants from adding a warning regarding the risk of NAION. Defendants could have at any time made "moderate changes" to the label.

216.   Specifically, Defendants could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic's and Mounjaro's labels without any prior FDA approval.

217.   Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

218.   Recently, the Third Circuit reaffirmed that plain text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case, Merck, could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal (FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. *See generally In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Case No. 22-3412, D.I. 82 at 73 on the docket (J. Jordan) (3d Cir. Sept. 20, 2024) (noting "the availability of a label

change via a CBE supplement is problematic for Merck, as will very often be the case for pharmaceutical companies raising an impossibility defense").

219.    Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic and/or Mounjaro, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

220.    Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

221.    Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic and/or Mounjaro's label without any prior FDA approval.

222.    Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

223.    On July 3, 2024, the Journal of the American Medical Association ("JAMA") – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide

for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[175]

224.    The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[176]

225.    The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[177]

**PARTY PLAINTIFF**

226.    Plaintiff DONALD L. DIETZ JR is a resident of the state of Pennsylvania and is currently 64 years old.

227.    On or around June of 2023, he consulted with Dr. Sharon Martin to discuss options for treatment of his type 2 diabetes and weight loss.

---

[175] Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited 12/17/2024).

[176] *Id.*

[177] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

228. As a result of this appointment, on or around June of 2023, Dr. Sharon Martin prescribed Mr. Dietz Jr. Ozempic. Mr. Dietz Jr. continued to take Ozempic through November 2023.

229. On around or around November 2023, Mr. Dietz Jr. switched from Ozempic to Mounjaro.

230. On or around April of 2024, Mr. Dietz Jr. started experiencing vision loss in both his left eye and right eye.

231. Between April of 2024 and June of 2024, Mr. Dietz Jr. visited several doctors and emergency rooms to determine the issues associated with his vision loss.

232. On June 19, 2024, Mr. Dietz Jr. visited Dr. William A. Cantore, a neuro-ophthalmologist associated with Penn State Health, Milton S. Hershey Medical Center.  At this visit, Dr. Cantore diagnosed Mr. Dietz Jr. with NAION in his left eye.

233. Soon thereafter, on June 29, 2024, Mr. Dietz Jr. awoke and had trouble seeing out of his right eye.

234. After visiting multiple doctors, on July 25, 2024, Mr. Dietz Jr. was diagnosed with NAION in his right eye by Dr. Kiran Turaka.

235. Mr. Dietz Jr. stopped taking Mounjaro.

236. Mr. Dietz Jr. suffered a significant loss of visual acuity in both his eyes.

237. His eyesight loss is permanent.

238. At all times material to the above, the Ozempic label and the Mounjaro label failed to adequately warn Mr. Dietz Jr. and his medical providers of the true risks of taking Ozempic and Mounjaro.

239. At all times material to the above, the marketing and advertising failed to

adequately warn Mr. Dietz Jr. and his medical providers of the true risks of taking Ozempic and Mounjaro.

240. His life is forever changed because of his usage of Ozempic and Mounjaro.

241. Mr. Dietz Jr. will never see clearly again as a result of his usage of Ozempic and Mounjaro.

242. Defendants knew or should have known that use of semaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

243. Defendants continue to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

244. Defendant's Ozempic and Mounjaro were at all times utilized and prescribed in a manner foreseeable to Defendant.

245. Plaintiff used Ozempic and Mounjaro, and did not misuse, or alter Ozempic and/or Mounjaro in an unforeseeable manner.

246. Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

247. As a result of Defendants' actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

248. As a direct result of being prescribed and using Ozempic and Mounjaro, Plaintiff has been permanently and severely injured, having suffered serious consequences.

249.    As a direct and proximate result of his Ozempic use and Mounjaro use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

250.    Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Ozempic was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

251.    Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Ozempic, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of his Type II diabetes and weight loss.

252.    Plaintiff's life is forever changed as a result of Defendants' actions and inactions.

**COUNT I**
**STRICT LIABILITY – FAILURE TO WARN**
**(Pursuant to Applicable Product Liability Law)**

253.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

254.    Ozempic and/or Mounjaro are products within the meaning of Pennsylvania products liability law.

255.    At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and/or Mounjaro and placed these drugs into the stream of commerce in

a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

256. Defendants, as the holders of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

257. Defendants, as a manufacturer, distributer, and marketer of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Ozempic and/or Mounjaro were inadequate.

258. Plaintiff did not have the same knowledge as Defendants and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

259. Defendants had a duty to provide adequate warnings and instructions for Ozempic and/or Mounjaro, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

260. Defendants had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Ozempic and/or Mounjaro, as it became or could have become available to Defendants.

261. Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drugs, Ozempic and/or Mounjaro, to health care providers empowered to prescribe and dispense Ozempic and/or Mounjaro to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and

affirmative misstatements, Defendants misled and continues to mislead the medical community about the risk and benefit balance of Ozempic and/or Mounjaro, which resulted in permanent injuries to Plaintiff.

262.    Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic and/or Mounjaro created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

263.    Despite the fact that Defendants knew or should have known that Ozempic and/or Mounjaro caused unreasonable and dangerous side effects, it continues to promote and market Ozempic and/or Mounjaro without providing adequate clinically relevant information.

264.    Defendants knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

265.    The Ozempic and/or Mounjaro supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendants possessed knowledge and information confirming the defective and unreasonably dangerous nature of Ozempic and/or Mounjaro but, despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Ozempic and/or Mounjaro cause serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendants have yet to issue any warnings or recommendations that patients taking Ozempic and/or Mounjaro undergo ophthalmological monitoring.

266.    Defendants' failure to provide adequate warnings or instructions rendered Ozempic and/or Mounjaro unreasonably dangerous in that it failed to perform as safely as an ordinary

patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits.

267. Defendants continue to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

268. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Ozempic and/or Mounjaro including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

269. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

270. Defendants continued to aggressively promote and sell Ozempic and/or Mounjaro, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

271. Defendants had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Ozempic and/or Mounjaro, and/or that there existed safer and or equally effective alternative drug products that do not pose this same risk.

272. By failing to adequately test and research harms associated with Ozempic and/or Mounjaro , and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Ozempic and/or Mounjaro  and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of

44

Ozempic and/or Mounjaro. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Ozempic and/or Mounjaro and should or could be reported as an adverse event.

273.    The semaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Ozempic and/or Mounjaro , Defendants failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote .

274.    Ozempic and/or Mounjaro is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendants had exercised all possible care in their preparation and sale.

275.    The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Ozempic and/or Mounjaro could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

276.    As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic and/or Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic

losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II

### STRICT LIABILITY – DESIGN DEFECT
### Pursuant to Applicable Product Liability Law

277. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

278. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and/or Mounjaro and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

279. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

280. Defendants, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

46

281.    Ozempic and/or Mounjaro are designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and were kept on the market despite being in a defective condition.

282.    Defendants knew or should have known the Ozempic and/or Mounjaro they developed, manufactured, labeled, marketed, sold, and/or promoted were defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries.

283.    Defendants had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

284.    Defendants sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

285.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Ozempic and/or Mounjaro, a defective product which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

286.    The Ozempic and/or Mounjaro supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

287.    The Ozempic taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

288. The Ozempic taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

289. Ozempic is a medication indicated for treatment of type 2 diabetes. Ozempic in fact causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

290. Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

291. The Ozempic supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

292. The Ozempic and/ or Mounjaro supplied to Plaintiff by Defendants was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Ozempic and/or Mounjaro makes the product unreasonably dangerous.

293. Ozempic and/or Mounjaro's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

294.    The intended or actual utility of Ozempic and/or Mounjaro is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

295.    The design defects render Ozempic and/or Mounjaro more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

296.    Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Ozempic and/or Mounjaro created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

297.    Ozempic and/or Mounjaro is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Ozempic and/or Mounjaro use could result in vision issues, Defendants failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

298.    Defendants acted unreasonably in its design of Ozempic and/or Mounjaro in that Defendants failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

299.    Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Ozempic and/or Mounjaro's defective design.

300.    Ozempic and/or Mounjaro is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendants had exercised all possible care in the preparation and sale of these products.

301.    As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic and/or Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT III
## NEGLIGENT FAILURE TO WARN

302.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

303.    At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and/or Mounjaro and placed these drugs into the stream of commerce

50

in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

304. Defendants, as the holders of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

305. Ozempic and/or Mounjaro was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

306. Defendants owed Plaintiff and other Ozempic and/or Mounjaro users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Ozempic and/or Mounjaro.

307. At all times material, Ozempic and/or Mounjaro was used in a manner intended and/or foreseeable to Defendants.

308. A reasonable patient or consumer of Ozempic and/or Mounjaro would expect the drug to be free of significant defects.

309. Defendants knew or had reason to know of facts establishing that Ozempic and/or Mounjaro could cause NAION and failed to warn of the risk.

310. At all times relevant hereto, the defective nature of Ozempic and/or Mounjaro was known to Defendants, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Ozempic and/or Mounjaro, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

311. In disregard of its duty to timely warn consumers of health risks associated with Ozempic and/or Mounjaro, Defendants committed one or more of the following negligent acts or omissions:

    a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Ozempic and/or Mounjaro were designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

    b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

    c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monioring was necessary.

312. At all relevant times, the label for Ozempic and/or Mounjaro was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

313. At all relevant times, the label for Ozempic and/or Mounjaro was inadequate because it did not warn and/or adequately warn that Ozempic and/or Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION.

314. The labels for Ozempic and/or Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic and/or Mounjaro.

315. Defendants' failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

316. Defendants' failure to warn of the significant risks of Ozempic and/or Mounjaro use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Ozempic and/or Mounjaro.

317.    Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Ozempic and/or Mounjaro, Plaintiff would not have elected to begin and/or continue Ozempic and/or Mounjaro.

318.    Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

319.    As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic and/or Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT IV**
**NEGLIGENCE**

320.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

321.    At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and/or Mounjaro and placed these drugs into the stream of commerce

in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

322. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

323. At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Ozempic and/or Mounjaro products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

324. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Ozempic and/or Mounjaro in that Defendants knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

325. Defendants had no reason to believe that intended and foreseeable users of Ozempic and/or Mounjaro, such as Plaintiff, would realize the potential harm from use of these products.

326. Defendants failed to exercise reasonable care to inform users, such as Plaintiff, of Ozempic and/or Mounjaro's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

327. Defendants breached its duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Ozempic and/or Mounjaro.

328. In disregard of its duty, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Ozempic and/or Mounjaro without thorough and adequate pre- and post-market testing of the products;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Ozempic and/or Mounjaro while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Ozempic and/or Mounjaro;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Ozempic and/or Mounjaro was safe for their intended use;

d. Failing to disclose and warn of the product defect to the medical community, and consumers that Defendants knew and had reason to know that Ozempic and/or Mounjaro was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Ozempic and/or Mounjaro's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Ozempic and/or Mounjaro;

g. Advertising, marketing, and recommending the use of Ozempic and/or Mounjaro, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with, and inherent in, the use of this product;

h. Representing that Ozempic and/or Mounjaro was safe for their intended use when in fact Defendants knew and should have known the product were not safe for their intended purpose;

i. Continuing to manufacture and sell Ozempic and/or Mounjaro with the knowledge that Ozempic and/or Mounjaro is unreasonably unsafe and dangerous;

j.  Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Ozempic and/or Mounjaro so as to avoid the risk of serious harm associated with the use of semaglutide. Failing to design and manufacture Ozempic and/or Mounjaro so as to ensure these drugs were at least as safe and effective as other similar products;

k.  Failing to design and manufacture Ozempic and/or Mounjaro was reasonably safe for their intended purpose in violation of objective safety standards;

l.  Failing to ensure that Ozempic and/or Mounjaro were accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m.  Failing to ensure that Ozempic and/or Mounjaro were accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Ozempic and/or Mounjaro and that use of semaglutide created a high risk of severe, permanent injuries to vision; and

n.  Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Ozempic and/or Mounjaro.

329.  A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

330.  As a direct and proximate result of the Defendants' negligent testing, monitoring, and pharmacovigilance of Ozempic and/or Mounjaro, Defendants introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

331.  As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic and/or Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability,

56

mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT V
## NEGLIGENT MISREPRESENTATION AND MARKETING

332.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

333.    At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and/or Mounjaro and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

334.    Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

335.    At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Ozempic and/or Mounjaro,

including, but not limited to, misrepresentations regarding the safety and known risks of Ozempic and/or Mounjaro.

336.    The information distributed by the Defendants to the public, the medical community, Plaintiff and Plaintiffs' healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Ozempic and/or Mounjaro.

337.    Defendants' conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic and/or Mounjaro and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Ozempic and/or Mounjaro .

338.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Ozempic and/or Mounjaro and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Ozempic and/or Mounjaro.

339.    Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Ozempic and/or Mounjaro, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

340.    Defendants made continued omissions in the Ozempic and/or Mounjaro labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

58

341. Defendants made additional misrepresentations beyond the product labeling by representing Ozempic and/or Mounjaro as a safe and effective treatment for type 2 diabetes and/or weight loss with only minimal risks.

342. Defendants misrepresented and overstated the benefits of Ozempic and/or Mounjaro to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss.

343. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Ozempic and/or Mounjaro, thereby causing Plaintiff to endure severe and permanent injuries.

344. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Ozempic and/or Mounjaro use before it was too late. Defendants knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendants.

345. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Ozempic and/or Mounjaro had the true facts not been concealed by the Defendants.

346. Defendants had sole access to many of the material facts concerning the defective nature of Ozempic and/or Mounjaro and its propensity to cause serious and dangerous side effects.

347. At the time Plaintiff was prescribed and administered Ozempic and/or Mounjaro, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

348. The Defendants failed to exercise ordinary care in making representations concerning Mounjaro while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendants negligently misrepresented Ozempic and/or Mounjaro's risk of unreasonable and dangerous adverse side effects.

349. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Ozempic and/or Mounjaro.

350. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

351. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

352. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

353. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic and placed them into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

354. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

355. Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendants and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Ozempic were safe, effective, fit and proper for their intended use.

356. Ozempic and/or Mounjaro materially failed to conform to those representations made by Defendants, in package inserts and otherwise, concerning the properties and effects of Ozempic, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic sold to Plaintiff.

357. Defendants expressly warranted that Ozempic was safe and well-tolerated. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

358. Ozempic does not conform to those express representations because they are

defective, not safe, and have serious adverse side effects.

359. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Ozempic, and Defendants' representations became part of the basis of the bargain.

360. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' representations that Ozempic was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

361. Plaintiff's healthcare providers justifiably relied on Defendants' representations through Defendants' marketing and sales representatives in deciding to prescribe Ozempic and/or Mounjaro over other alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to purchase and use the drug.

362. Plaintiff purchased and used Ozempic without knowing that drug is not safe and well-tolerated, but that Ozempic instead causes significant and irreparable vision loss and eye damage.

363. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in

excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

364.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

365.    At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Ozempic, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

366.    Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

367.    Defendants were the sellers of Ozempic and sold Ozempic to be taken for treatment of type 2 diabetes and weight loss.

368.    When Ozempic was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

369.    Defendants impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

370.    Defendants breached their implied warranties of the Ozempic and/or Mounjaro product because the Ozempic and/or Mounjaro sold to Plaintiff was not fit for its ordinary purpose to help with weight loss.

371.    Ozempic would not pass without objection in the trade; they are not of fair average quality; they are not fit for their ordinary purposes for which the products are used; were not adequately contained, packaged and labeled; and fail to conform to the promises or affirmations of fact made on the container or label.

372.    Defendants' breach of their implied warranties resulted in use of the unreasonably dangerous and a defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VIII
### VIOLATION PENNSYLVANIA UNFAIR TRADE PRACTICES / CONSUMER FRAUD ACT (73 P.S. SECT. 201-1) AND/OR PA CONSUMER PROTECTION ACT

373.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

374.    Plaintiff purchased and used Ozempic and/or Mounjaro primarily for personal use and therefore suffered ascertainable losses as a result of Defendants' actions in violation of Pennsylvania Unfair Trade Practices/Consumer Fraud Act, 73 P.S. Sect. 201-1, *et seq.*

375.    Had Defendants not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Ozempic and/or Mounjaro and would not have incurred damages.

376.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendants not engaged

in unfair and deceptive conduct.

377.   Despite knowing the falsity and misleading nature of their claims, Defendants engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Ozempic.

378.   Defendants intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic.

379.   Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Ozempic.

380.   Defendants had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Ozempic.

381.   Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Mr. Dietz Jr. constituted unfair and deceptive acts and trade practices in violation of Pennsylvania Unfair Trade Practices/Consumer Fraud Act, 73 P.S. Sect. 201-1, *et seq*.

382.   As a direct and proximate result of Defendants' conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Ozempic, DONALD L. DIETZ JR suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally,

for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IX
## PUNITIVE DAMAGES

383.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

384.   The acts and omissions of Defendants described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendants' officers, directors, and/or managing agents.

385.   Defendants' actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

386.   Defendants sold Ozempic to Plaintiff and other consumers throughout the United States despite their knowledge that Ozempic can cause the problems as set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by Plaintiff.

387.   Defendants misled both the medical community and the public, including Plaintiff and his physicians, by making false representations about the safety and effectiveness of Ozempic and by failing to provide adequate instructions concerning its use.

388.   Defendants downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Ozempic despite available information demonstrating that drug could cause NAION and irreversible vision loss.

389.   Defendants were or should have been in possession of evidence demonstrating that Ozempic and/or Mounjaro use could cause NAION and irreversible vision loss. Nevertheless, Defendants continues to market Ozempic by providing false and misleading information with

regard to their safety and effectiveness.

390.    Defendants failed to provide warnings that would have dissuaded health care professionals from using Ozempic, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Ozempic.

391.    As a proximate result of Defendants' acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to Plaintiff's use of Ozempic and/or Mounjaro.

392.    As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

393.    Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

394.    Defendants have engaged in conduct entitling Plaintiff to an award of punitive damages pursuant to Common Law principles and the statutory provisions of Pennsylvania law.

395.    Defendants' actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

396.    Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendants.

397.    Defendants' conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

398. Consequently, Defendants are liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

399. Defendants are estopped from relying on the statute of limitations defense because Defendant actively concealed information concerning known risks, side effects, and defects in Ozempic and/or Mounjaro. Instead of revealing such information to the FDA or the public, Defendants have continued to represent Ozempic and/or Mounjaro as safe for its intended use.

400. Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Ozempic and/or Mounjaro. Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendants are estopped from relying on any statute of limitations defense.

## DEMAND FOR JURY TRIAL

401.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in his favor and against Defendants awarding the following:

1. A monetary award, sufficient to compensate Plaintiff for the following categories of damages:

   a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

   b. actual and treble damages in such amount to be determined by this Court and as provided by law;

   c. exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

   d. pre-judgment and post-judgment interest;

   e. costs including court costs, and other litigation expenses; and

   f. any other relief the Court may deem just and proper.

Dated: March 27, 2026                    Respectfully Submitted,

*/s/ Jason Goldstein*
Jason S. Goldstein, Esq.
Attorney I.D. No. 334857
**PARKER WAICHMAN LLP**
6 Harbor Park Drive
Port Washington, New York 11050
(516) 466-6500
(516) 466-6665
jgoldstein@yourlawyer.com


*Attorney for Plaintiff*